UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BRYAN WAYNE FLOYD | ) | CASE NO.  17-10737(1)(7) |
| | ) | |
| _____ Debtor(s) _____ | ) | |
| | ) | |
| JM BURNS STEEL SUPPLY, INC. | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| vs. | ) | A.P. No. 18-1024 |
| | ) | (consolidated with A.P. No. 18-1025) |
| | ) | |
| BRYAN WAYNE FLOYD | ) | |
| | ) | |
| _____ Defendant _____ | ) | |

**MEMORANDUM-OPINION**

This matter came before the Court for trial on two adversary proceeding complaints filed by Plaintiff, JM Burns Steel Supply, Inc. ("JM Burns"), to deny Defendant/Debtors Bryan Wayne Floyd ("Bryan Floyd") and James Scott Floyd ("Scott Floyd") a Chapter 7 discharge for alleged actions pre-petition in transferring and concealing assets to hinder the collection activities of a judgment creditor, verifying under oath false bankruptcy schedules and statements, making false oaths, failing to keep or preserve records sufficient to ascertain financial conditions or business transactions, failing to explain satisfactorily a loss of assets or deficiency of assets, refusing to obey a court order to produce documents, committing such acts concerning insiders, and for bad faith.  The Court considered the sworn witness testimony, admitted exhibits, pleadings and the facts and circumstances of this case.  The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52, made applicable herein by Fed. R. Bankr. P. 7052.

**FINDINGS OF FACT**

1.      Defendant Debtor Bryan Floyd filed a skeletal Petition seeking relief under Chapter 13 on July 30, 2017 at lead Case No. 17-10737-jal.  Bryan Floyd filed his Schedules and a proposed Chapter 13 Plan on August 14, 2017.  (Doc 10, 11).[1]

2.      On August 31, 2017, this Court entered Orders granting the motions of JM Burns for Rule 2004 Examinations of Bryan Floyd and his non-debtor spouse, Stephanie Ann Floyd.  (Doc 25, 26).  The Order required Bryan Floyd and Stephanie Floyd to produce designated documents in connection with their examinations.

3.      On September 14, 2017, Bryan Floyd filed an Amended Schedule D.  (Doc 30).

4.      The Rule 2004 Examination of Bryan Floyd was conducted on November 2, 2017. (Doc 59).

5.      JM Burns filed a Motion to Dismiss or Convert the Chapter 13 contending that Bryan Floyd was ineligible for relief under Chapter 13.  On February 7, 2018, Bryan Floyd's Petition was converted to a Chapter 7 pursuant to his own motion.  (Doc 66).

6.      On February 20, 2018, Bryan Floyd filed Schedules in the converted case. (Doc 69).

7.      On February 26, 2018, this Court entered an Order directing that Bryan Floyd and his non-debtor spouse, Stephanie Ann Floyd, comply with the Rule 2004 Examination Order on or before March 9, 2018 by producing the documents previously ordered in the Rule 2004 Examination Order or show cause why they should not be held in contempt.  (Doc 75).

---

[1]The citations herein reference the docket number of the pleadings in the applicable adversary proceeding.

8.      On June 12, 2018, the Chapter 7 Trustee filed a Report of no distribution abandoning assets valued at $280,611 and indicating claims of $6,832,928.45 in the Bryan Floyd case.

9.      Upon his own motion, Scott Floyd's Chapter 13 Petition was converted to Chapter 7 on August 15, 2017 and he filed Schedules on August 17, 2017.  (Doc 12).

10.     On August 31, 2017, this Court entered Orders granting the Motion of JM Burns for 2004 examinations of Scott Floyd and his non-debtor spouse, Jessica Floyd.  (Doc 30, 31).  The Order required Scott Floyd and Jessica Floyd to produce designated documents in connection with their examinations.

11.     The Rule 2004 Examination of Scott Floyd and Jessica Floyd were conducted on November 1, 2017.  (Doc 58).

12.     On February 20, 2018, Scott Floyd filed Amended Schedules B, C, and F.  (Doc 48, 49).

13.     On February 26, 2018, this Court entered an Order directing that Scott Floyd and his non-debtor spouse, Jessica Floyd, produce the documents previously ordered in the Rule 2004 Examination Order entered on August 31, 2017 or show cause why they should not be held in contempt.  (Doc 52).

14.     On June 12, 2018, the Chapter 7 Trustee issued a Report of no distribution abandoning assets valued at $264,759.58 and indicating claims of $6,197,917 in the Scott Floyd case.

15.     Before signing their Petitions, Schedules, and Statements of Financial Affairs, Bryan Floyd and Scott Floyd each read them and signed them, under oath, knowing that their creditors

would rely upon them and after being warned of possible sanctions and penalties for false statements.

16.     JM Burns filed its Complaints objecting to discharge on June 3, 2018 at Case No. 18-01024 against Bryan Floyd and Case No. 18-01025 against Scott Floyd.  By Order entered November 13, 2018, both Adversary Proceedings were consolidated, with Case No. 18-1024 being the lead case.  (Doc 16).

17.     Bryan Floyd and Scott Floyd are twin brothers who reside in adjacent properties on Floyd Drive in Liberty, Casey County, Kentucky.  Both of them have equally owned, managed, and operated a number of business ventures for many years pre-petition, primarily related to a farm gate business started by their father, Wayne Floyd.  Both of them completed high school, attended college, and have obtained aviation pilot licenses.

18.     In recent years, Scott Floyd managed and operated Chieftain Steel, LLC which produced steel tubing and Bryan Floyd managed and operated Floyd Industries which manufactured steel tubing into farm gates and other products.

19.     JM Burns sold steel pre-petition to businesses operated by the Floyds.  In 2014, the businesses defaulted in payment for the goods sold.  In connection with the resolution of the defaulted debts with JM Burns, the businesses entered into a forbearance agreement which the Floyds personally guaranteed in August, 2015.  Subsequently, the Floyds defaulted under the contracts with JM Burns.

20.     JM Burns filed suit in the Hamilton County, Ohio Court of Common Pleas against Bryan Floyd, Scott Floyd, and Chieftain Steel on April 1, 2016.  The Ohio Court entered judgment

in favor of JM Burns against Bryan Floyd and Scott Floyd, jointly and severally, on August 8, 2016 in the principal amount of $156,301.92, plus accruing interest, attorney fees, and costs.

21.     Thereafter, JM Burns domesticated the Ohio judgment in the Casey County, Kentucky Circuit Court, filed judgment liens, and commenced foreclosure proceedings against the Floyds.

22.     Bryan Floyd and Scott Floyd had knowledge of their debts to JM Burns as they objected to the domestication of the judgment in Kentucky, moved to stay execution on the judgment, defended the foreclosure proceedings, and scheduled the debt of JM Burns in their Petitions.  The judgment was domesticated over their objections, the requests for a stay of execution were denied, and JM Burns pursued execution in state court.  The judgments were entered in the Casey County Circuit Court on September 6, 2016.

23.     Depositions of Bryan Floyd and Scott Floyd were noticed in state court for July 31, 2017.  Both of the skeletal Petitions in the lead cases were filed the day prior to the scheduled depositions of Bryan Floyd and Scott Floyd thereby invoking the automatic stay and cancelling the depositions.

24.     Pre-petition Bryan Floyd and Scott Floyd operated multiple businesses in Casey County, Kentucky.  The Floyds are, or were, joint owners of the following business entities: (1) Floyd Industries, LLC; (2) Chieftain Steel, LLC; (3) The Pennyrile Company; (4) Twin F Trucking, LLC; and (5) Broken Arrow, LLC.  As of the Petition date, Bryan Floyd and Scott Floyd jointly owned these entities.  Additionally, Bryan Floyd and Scott Floyd individually did business as "Twin F Ranch" pre-petition.

25.    Floyd Industries, LLC and Chieftain Steel, LLC were merged into The Pennyrile Company and are the subject of a Chapter 11 case in this Court being jointly administered as *In re Chieftain Steel, LLC aka The Pennyrile Company, LLC* , Case No. 16-10407 ("Chapter 11 Case"). On January 23, 2018, petitioning creditors of the Chapter 11 Debtors initiated an involuntary proceeding against the reorganized network at Case No. 18-10046 ("Involuntary Case") based upon the Chapter 11 Debtor's failure to pay its primary secured creditor, failure to pay post-petition debts, and over drawing its bank accounts.

26.    The Floyds testified that the Pennyrile business ceased operations in January, 2018 and the assets of the company were surrendered to United Cumberland Bank ("UCB"). Testimony from the Floyds and correspondence from UCB's attorney confirm that the business records of Pennyrile were placed into a storage space in Casey County at this time. The Floyds were able to access the storage space upon request but never did so.

27.    Approximately three months after the Floyds filed their Petitions, Scott Floyd's non-debtor spouse, Jessica Floyd, organized a new limited liability company with the Kentucky Secretary of State on December 19, 2017 named "Pennyrille Company, LLC" ("Pennyrile 2"). The new company has the same name as the Chapter 11 Debtor, adding an additional "l" to the name Pennyrile.

28.    Jessica Floyd had no employment or source of income as of the date of the Petitions and had no income for several years prior. Pennyrile 2 employs Bryan Floyd and Scott Floyd, and has done so since early 2018. Pennyrile 2 acquired trucks and other assets formerly owned by Twin F Trucking, LLC.

-6-

29.    Bryan Floyd's Statement of Financial Affairs disclosed gross income from January 1, 2017 to July 30, 2017 of $69,183.63.  For 2016, gross income was disclosed as $85,584.51.  For 2015, gross income was disclosed as $87,009.  Part 2, Question 5 indicates no other source of income for 2015, 2016 or 2017.

30.    Bryan Floyd's Statement of Financial Affairs discloses no gifts of more than $600 per person or any transfers of property other than in the ordinary course of business or financial affairs.

31.    On Part 8, Question 20 of Bryan Floyd's Statement of Financial Affairs the Debtor indicated that, within one year prior to the Petition, there were no financial accounts or instruments held in his name, or for his benefit, closed, sold, moved or transferred.

32.    In Part 11 of Bryan Floyd's Statement of Financial Affairs there are no sole proprietorships, limited liability companies, or other business entities identified for the four years prior to the Petition.

33.    Part 11, Question 28 of Bryan Floyd's Statement of Financial Affairs indicates that he did not give a financial statement to anyone about a business within two years pre-petition.

34.    In Schedule A, Bryan Floyd listed his residence at 244 Floyd Drive, Liberty, Kentucky 42539 as the only real estate owned with the stated value of $385,000.  Multiple vehicles were listed with the total value of $52,500.  Household goods and furnishings, electronics, firearms, and other personal property totaled $14,100.

35.    Schedule B listed no bank accounts for Bryan Floyd.

36.    Schedule B listed an ownership interest in The Pennyrile Company, LLC and Broken Arrow, LLC with unknown values.

-7-

37.     Schedule B disclosed no interest in property due from someone who has died.

38.     In total, Schedule A disclosed $385,000 in real estate, and Schedule B disclosed total personal property of $93,611.

39.     Schedule I for Bryan Floyd listed gross monthly income of $6,520.

40.     Bryan Floyd filed Amended Schedules on September 14, 2017 which updated the amount owed to a secured creditor on Schedule D but made no other changes.

41.     On February 20, 2018, Bryan Floyd filed an Amended Statement of Financial Affairs and Schedules.  In the Amended Statement of Financial Affairs, Bryan Floyd corrected his marital status to indicate that he was married.  The reported gross income for 2015, 2016, and 2017 remained unchanged.  On Part 3, Question 8, Bryan Floyd stated that within one year before filing the Petition, he did not make any payments or transfer any property on account of a debt that benefitted an insider.  The Amended Statement of Financial Affairs did not disclose any additional gifts or transfers.

42.     While the original Statement of Financial Affairs disclosed no closed bank accounts, the Amended Statement of Financial Affairs disclosed a single checking account with Casey County Bank that was closed within one year pre-petition.  The Amended Statement of Financial Affairs did not indicate any other bank accounts.

43.     The Amended Statement of Financial Affairs disclosed additional ownership interests in Floyd Industries and Twin F Trucking, LLC.  The Amended Statement of Financial Affairs also disclosed financial statements given in connection with the Chapter 11 Case.

44.     The Amended Statement of Financial Affairs did not disclose an interest in any property that is due from someone who has died.

45.     Due to the fact that Bryan Floyd only owned one half of his residence, the real estate value was reduced to $192,500.  Total personal property was listed as $88,111 with personal and household items listed as 8,600.  The total of all property on Schedules A and B was $280,611.

46.     James Scott Floyd filed his Statement of Financial Affairs and Schedules on August 17, 2017.  In Part 2, Question 4, Scott Floyd listed income from January 1 to July 30, 2017 of $69,183.63.  Income for 2015 was $87,009.92 and gross income for 2016 was $85,584.51.  No other income was listed for 2015, 2016, 2017.

47.     The Statement of Financial Affairs indicates no gifts over $600 or other transfers to insiders.

48.     Part 8, Question 20 of the Statement of Financial Affairs listed no financial accounts which were closed one year prior to the petition.

49.     Part 11 of the Statement of Financial Affairs lists no connections to sole proprietorships, limited liability companies, or other business entities.  Question 28 lists no financial statements given to anyone about a business for the prior two years.

50.     Scott Floyd's Schedule A lists a one-half interest in his residence with a value of $200,000.  Multiple motor vehicles were listed with the total value of $23,800.  Household goods and furnishings, electronics, and other personal property were listed with a value of $7,250.

51.     Part 4, Question 17, disclosed a single checking account with Casey County Bank.

52.     Part 4, Question 19, disclosed a one-half interest in The Pennyrile Company and a one-half interest in Broken Arrow, LLC.  Total real estate was $200,000, and total personal property was $64,759.58.

53.     In Parts 4, 5 and 6 of the Statement of Financial Affairs, Scott Floyd disclosed no business related property, farm, or other property.

54.     Schedule I for Scott Floyd disclosed gross monthly income of $6,540.

55.     On February 20, 2018, Scott Floyd filed Amendments to Schedules B and C disclosing ownership interests in Twin F Trucking, LLC, Floyd Industries, Chieftain Steel, and an insurance policy.  No further amendments or changes were made.

56.     The Order for Rule 2004 Examination required Bryan Floyd and Scott Floyd to produce certain documents.  Both Debtors delegated the task of producing the information to the business manager, Kathy Choate.  Upon examination, neither Scott Floyd or Bryan Floyd knew what had been produced or what was missing as they had not reviewed the documents.

**A.      Tax Returns.**

57.     In connection with the Order for Rule 2004 Examination, Scott Floyd produced federal tax returns for 2014 and 2015. Scott Floyd's tax returns reveal that his reported wages, commissions, and tips were zero for both years.  This information conflicts with the wages, commissions, and tips disclosed in his Statement of Financial Affairs.

58.     The tax returns reported that the Floyds did business as a sole proprietorship as Twin F Ranch and reported a loss for "cattle business."

59.     Scott Floyd testified in November, 2017 at his Rule 2004 Examination that he sold all of the cattle and ceased operations as Twin F Ranch four or five years prior.  At trial, the Floyds testified that any cattle on their property since that time belonged to a friend.

60.     Bryan Floyd produced only his 2015 tax return.

61.     Tax returns were not produced for tax years 2016, 2017, or 2018 on the basis that they had not been filed.

62.     Bryan Floyd testified that he had filed his 2016 tax return at the time of trial and it was listed as Exhibit DX42, however, no tax return was ever produced and there was no document uploaded as Exhibit DX42.

**B.    Bank Accounts**.

63.     The Petitions for the Floyds failed to report numerous bank accounts, both open and closed.  Through amendments, Bryan Floyd and Scott Floyd each disclosed a single checking account with Casey County Bank.  However, they continued to conceal multiple accounts which were only uncovered by JM Burns through subpoenas.

Scott Floyd

64.     In response to a Subpoena, Casey County Bank produced bank statements for a money market account opened by Scott Floyd in 2002.  This account was not listed in the Petition and was not disclosed in discovery.  Scott Floyd withdrew the balance of $3,219.30 on March 27, 2017, approximately four months prior to his Petition.

65.     Additionally, documents from Casey County Bank revealed a savings account which Scott Floyd closed on October 11, 2016 withdrawing $1,165.72.  This account was not disclosed in discovery and is not listed in the Petition.

66.     Additionally, records produced by Casey County Bank reveal another checking account titled to James Scott Floyd dba Twin F Ranch which was opened in December, 1995 and remained open pre-petition and post-petition.  This account was not disclosed in discovery and was not listed in the Petition.

67.     Schedule B to Scott Floyd's 2015 federal tax return reveals income from a Ford money market account.  This account was not listed in the Petition and was not disclosed in discovery.

Bryan Floyd

68.     Bryan Floyd was party to a joint checking account with Scott Floyd for Twin F Ranch which was opened on December 6, 1995 and remains open post-petition.  Bryan Floyd did not disclose this account in the Petition.

69.     Bryan Floyd also had an account with BB&T pre-petition.  The record does not indicate when it was opened or whether it was closed.  The account was not disclosed in the Petition.

**C.     Inheritance.**

70.     Scott Floyd testified at his Rule 2004 Examination that his mother had recently passed away and that he did not believe he would receive an inheritance.  In discovery, Scott Floyd later indicated in correspondence dated February 5, 2018 that neither he nor Bryan Floyd believed that they were entitled to any inheritances.

71.     After repeated request from JM Burns, Scott Floyd and Bryan Floyd provided a copy of the Will of Betty Floyd, on March 27, 2018.  However, neither Scott Floyd nor Bryan Floyd ever amended their Petitions or supplemented their responses to discovery despite the fact that they filed a petition to probate the will in the Casey County, Kentucky District Court on September 11, 2018.

72.     The documents filed with the District Court indicate that Bryan Floyd and Scott Floyd were to inherit a 50% interest in approximately 28 acres in Liberty, Kentucky valued at $155,000.  The other one-half interest in this property was owned by their father, Wayne Floyd. While the Floyds testified that this property was among multiple properties subject to the secured

claim of United Cumberland Bank, no information was provided in discovery as to whether there was any equity or why they would probate real estate that has no value.

**D.     Reported Income.**

73.     Scott Floyd testified at trial and in his Rule 2004 Examination that he was paid $1,500 weekly, that the source of this income is the Pennyrile Company (previously Floyd Industries and Chieftain Steel prior to merger), that there was no other source of income going back multiple years, and that his spouse had no income.  In Schedule I, Scott Floyd disclosed his net monthly income after taxes as $5,529.  Scott Floyd's 2017 W-2s total $63,206.

74.     Bryan Floyd likewise testified at trial and in his Rule 2004 Examination that he was paid $1,500 weekly, that the source of the income was is the Pennyrile Company (previously Floyd Industries and Chieftain Steel prior to merger), that there was no other source of income going back multiple years, and that his spouse had income which was deposited and segregated into a separate account with Monticello Bank to which he had no access.  In Schedule I, Bryan Floyd disclosed his net monthly income after taxes as $5,280.  Bryan Floyd's 2017 W-2s total $63,076.

75.     Despite the Floyds' income being reported to the IRS as approximately $63,000 for the full year 2017, their Statements of Financial Affairs report gross income of approximately $69,000 for the first seven months of 2017.

76.     The Floyds offered vague and contradicting testimony and were unable to explain the discrepancy in their reported wages. The wage information listed in the Petition is at odds with their tax returns, W-2s, personal financial statements, credit applications, and the amount deposited into bank accounts.

E.    **Personal Financial Statements.**

77.    In his Rule 2004 Examination, Scott Floyd testified that he had given a personal financial statement in the prior two years.  However, he did not produce these statements in discovery and JM Burns only obtained them via subpoena to the bank.

78.    Post-petition but prior to his Rule 2004 Examination, Scott Floyd provided a personal financial statement ("PFS 1") to Casey County Bank dated September 29, 2017 (Doc 36-20, p. 9). PFS1 discloses total assets of $618,000, liabilities of $225,000, and a net worth of $393,000. Deducting Scott Floyd's personal residence leaves total personal property of $218,000, while his Petition schedules only $64,759.58.  The values attributed in PFS1 for assets are materially higher than as attributed in the Petition.

79.    In his Rule 2004 Examination, Bryan Floyd testified that he had given a personal financial statement in the prior two years.  However, he did not produce these statements in discovery and JM Burns only obtained them via subpoena to the bank.

80.    One year pre-petition, Bryan Floyd submitted a Personal Financial Statement ("PFS2") to United Cumberland Bank in July, 2016.  (Doc 36-18)  PFS2 listed $595,000 in assets including $150,000 in personal property. Yet, Bryan Floyd's Petition discloses no transfers of assets in the one year prior to the Petition and only $93,611 in personal property.

81.    In July, 2015, Bryan Floyd submitted a personal financial statement ("PFS3") to United Cumberland Bank in which he represented ownership of an unencumbered property in Florida valued at $100,000 which had been gifted to him  (Doc 36-18).  Upon cross-examination, Bryan Floyd testified that the bank completed PFS3 on his behalf, that he did not read it before signing it, and that he did not ever own this property.

-14-

82.    Two months post-petition, Bryan Floyd submitted a personal financial statement ("PFS4") to Casey County Bank.  (Doc 36-20, p. 8).  In PFS4, Bryan Floyd represented that he had total assets of $622,500 and a net worth of $396,500.  Among these assets listed was real property valued at $100,000, which was not listed in the Petition.  The values for the disclosed assets in PFS4 are materially higher than what was listed in the Petition two months earlier.

83.    The Floyds did not produce PFS1, PFS2, PFS3, or PFS4 in connection with their Rule 2004 Examinations despite such documents being expressly ordered.  (No. 17-10737, Doc 39, p. 4, ¶ 19; No. 17-10738, Doc 33, p. 4, ¶ 19).  Nor did the Floyds produce PFS1, PFS2, PFS3, or PFS4 in discovery despite the documents being expressly requested.  JM Burns only obtained the personal financial statements of the Floyds through subpoenas issued to nonparties.

**F.    The Use of Non-Debtor Bank Accounts.**

84.    Both Bryan Floyd and Scott Floyd opened accounts titled solely to their spouses pre-petition for the express purpose of transferring their income to their spouses to avoid execution by JM Burns in state court.

<u>The Jessica Floyd Account</u>

85.    Pre-petition, Scott Floyd had a joint checking account with his spouse Jessica Floyd at Case County Bank for which he deposited his income and paid his debts.

86.    On July 15, 2016, less than a month before judgment was entered against him in Ohio and while he was subject to suit by JM Burns, Scott Floyd opened a separate checking account with the Casey County Bank titled only to his spouse, Jessica Floyd ("9092 Account").  He then stopped utilizing the joint account and utilized only the 9092 Account.

-15-

87.     Scott Floyd deposited all of his wages in the 9092 Account from August, 2016 through the date of the Petition and continued to do so post-petition.  His wife had no income or wages to deposit into the account.

88.     The 9092 Account was not disclosed in the Petition.

89.     In the one year period prior to the Petition, Scott Floyd deposited over $110,366 into the 9092 Account.  In six months  post-petition Scott Floyd deposited over $51,017 into the 9092 Account.

90.     The stated purpose of the 9092 Account was to avoid execution by JM Burns by transferring Scott Floyd's income to Jessica Floyd where it could not be garnished.

91.     In 11 months pre-petition, Scott Floyd's deposits of $110,366 averaged over $10,000 per month.  Scott Floyd had no explanation for the reason his deposits into the 9092 Account were substantially in excess of his reported income of $6,000 monthly.

<u>The Stephanie Floyd Account</u>

92.     Bryan Floyd utilized a joint checking account with his spouse, Stephanie Floyd, at Casey County Bank pre-petition.  Stephanie Floyd also maintained a separate checking account with Monticello Bank in which she deposited her wages.  Bryan Floyd testified that he had no access to the Monticello Bank account and never transacted business in it.

93.     On August 8, 2016, the same day judgment was rendered against him in Ohio in favor of JM Burns, Bryan Floyd caused a new checking account to be opened in the name of his spouse, Stephanie Floyd, with the Casey County Bank ("5849 Account").  Bryan then ceased utilizing his joint checking account with Casey County Bank and deposited all of his income into the 5849 Account.

-16-

94.     All of the funds deposited into the 5849 Account belonged to Bryan Floyd and none
of the deposits belonged to Stephanie Floyd.

95.     During the 11 months prior to his Petition, Bryan Floyd deposited over $140,316 into
the 5849 Account.  The monthly deposits average over $12,000 and far exceed the $6,000 monthly
income disclosed in his Petition and his Rule 2004 Examination testimony.

96.     Bryan Floyd testified at trial that significant difference between his deposits and
reported income was the result of receiving business expense reimbursements.  However, the only
documentation he produced to substantiate this claim were Exhibits DX80 and DX81.

97.     Exhibit DX80 is a check register for Chieftain Steel, LLC covering the period of
November, 2016.  Excluding payroll checks, DX80 contains one check to Bryan Floyd titled
"CREDIT CARD PAYMENT" in the amount of $3,000.  It is not coded as a business expense
reimbursement as are other checks on the register are so coded.  Exhibit DX81 is the Chieftain Steel,
LLC check register for January, 2017.  It contains a payment to Bryan Floyd in the amount of $3,000
for "credit card payment for supplies."

98.     Bryan Floyd provided no evidence to link these two transactions or explain the
discrepancy between his deposits into the 5849 Account and his reported income.  Moreover, the
combined amount of the two payments comes nowhere near accounting for the amount of the
discrepancy.

99.     Moreover, Bryan Floyd did not produce this information until the trial.  Business
expense reimbursement information was ordered to be produced in connection with the Rule 2004
Examination. (No. 17-10737, Doc 39, p. 4, ¶ 12).  The same information was requested in discovery

by JM Burns Steel.  The information was not provided in the lead case, was not provided in discovery and Exhibits DX80 and DX81 were not filed June 30, 2019, during the trial.

100.    Bryan Floyd also testified that a $26,000 deposit to the 5849 account on May 16, 2017 represented the proceeds of the sale of a Jeep.[2]  Removing that deposit from one year period pre-petition, brings the total deposits by Bryan Floyd into the 5849 Account to $114,316.  This is substantially similar to the $110,366 deposited in the same period by Scott Floyd who repeatedly testified that he never received business expenses reimbursements.  Further, the $3,000 check listed in Exhibit DX80 does not appear in the November, 2016 deposits to the 5849 Account.  (Doc 36-20).

101.    Aside from these two transactions, Bryan Floyd offered no explanation for the difference in his reported income and the deposits into the 5849 Account.

102.    Both of the Floyds testified that they opened the 9092 and 5849 Accounts upon the advice of an attorney.  However, they proffered no evidence to support such a claim.

103.    At trial, they first contended that their trial counsel advised them to utilize the accounts, then relented and conceded that they were unsure of the name of the attorney that provided such advice.  No evidence was introduced to establish that their actions were on the advice of counsel and, more importantly, even if such evidence were produced, their conduct was in bad faith as the express stated reason for the 9092 and 5849 Accounts was to avoid the execution efforts of JM Burns in state court.

---

[2] The sale of the Jeep was not disclosed in Bryan Floyd's Statement of Financial Affairs, nor was any evidence relating to the sale produced despite being requested in discovery by JM Burns.  This information was also required to have been produced in connection with Bryan Floyd's Rule 2004 Examination and the Show Cause Order, but was not.  (No. 17-10737, Doc 39, p. 4, ¶ 20).

G.      **Applications for Extensions of Credit**.

104.    Two day prior to the Petition, Bryan Floyd submitted an application for credit to Community Trust Bank to purchase a 2015 Chevrolet Truck for $32,657.  In this credit application, Bryan Floyd represented that his income was $25,000 per month.

105.    On June 16, 2016, Bryan Floyd submitted an application for credit to Eaglemark Savings Bank to purchase a Harley Davidson motorcycle.  In this credit application, Bryan Floyd represented that his income was $10,000 per month.

106.    For the periods of time covered by these credit applications, Bryan Floyd's Petition and Rule 2004 Examination testimony were that his income was, in truth, $6,000 per month.

107.    At trial, Bryan Floyd testified that he was providing the income of his business as his own income on the credit applications.

H.      **Transfers to IRAs.**

108.    Scott Floyd utilized another account with Casey County Bank that was not disclosed in the Petition ("0271 Account").  From the 0271 Account, Scott Floyd transferred $11,000 to an individual retirement account for which he claimed an exemption shortly before filing the Petitions. Scott Floyd's tax returns reveal that he had no prior practice of such contributions, having only contributed $290 annually in prior years to the IRA.

I.      **Lifestyle and Use of Concealed Funds.**

109.    During the time they were concealing their assets from creditors, the Floyds utilized the transferred assets to support their lifestyle.  Credit card statements for Scott Floyd and Bryan Floyd (PX17) reveal that they spent a substantial amount of time and money in Florida pre-petition. Bryan Floyd took his family on a Royal Caribbean cruise in March, 2017 and was on vacation in

Charleston, South Carolina in July, 2017.  Bryan and Scott both vacationed together in California and Oregon from July 13 through July 25, 2017, five days prior to the Petitions.

## CONCLUSIONS OF LAW

1.	To the extent any of the above Findings of Fact should be considered a Conclusion of Law, they are hereby incorporated by reference.

2.	Jurisdiction of Debtors' bankruptcy cases and the related adversary proceedings are vested in the United States District Court for the Western District of Kentucky.  28 U.S.C. § 1334(a). That court has referred all cases under Title 11 of the United States Code and all adversary proceedings and contested matters to the United States Bankruptcy Court for the Western District of Kentucky by General Order.

3.	This adversary having been appropriately referred, this Court has core bankruptcy jurisdiction to enter a final order and judgment, to determine whether Debtors should be granted a discharge.  28 U.S.C. § 157(b)(2)(J).  Defendants admit jurisdiction in their respective Answers.

4.	As Plaintiff, JM Burns bears the burden of proof in seeking to deny the Debtors' discharges.  Fed. R. Bankr. P. 4005.  This burden of proof is by a preponderance of the evidence. *Barclays/American Business Credit, Inc. v. Adams*, 31 F.3d 389, 394 (6th Cir. 1994) (relying on *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

### Denial of Discharge - 11 U.S.C. § 727(a)(2)

5.	Pursuant to 11 U.S.C. Section 727(a)(2) a bankruptcy discharge can be denied when the debtor, with intent to hinder, delay or defraud a creditor, has concealed property of the estate within the one year period prior to the petition, or after the date of the petition.

-20-

Section 727(a)(2) provides:

The court shall grant the debtor a discharge, unless the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed -

(A)    property of the debtor, within one year before the date of the filing of the petition; or

(B)    property of the estate, after the date of the filing of the petition.

6.    The fundamental purpose of Section 727(a)(2) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations. *Retz v. Samson*, 606 F.3d 1189, 1196 (9th Cir. 2010); *see also In re Eifler*, No. 3:13-cv-00785-JHM, 2014 WL 314473 (W.D. Ky. Jan. 28, 2014). This Court concludes that the deliberate actions of the Floyds frustrated that fundamental purpose in this case.

7.    A debtor's intent need not be fraudulent to meet the requirements of Section 727(a)(2). Because the language of the statute is disjunctive, it is sufficient if the debtor's intent is to hinder or delay a single creditor. *Id.* Likewise, lack of injury is irrelevant for purposes of a denial of discharge. *Id.*

8.    To prove that a debtor's discharge should be denied for concealment, the plaintiff must show by a preponderance of the evidence that: (1) the act complained of was done within one year prior to the date the petition was filed; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate. *In re Blackburn*, 385 B.R. 660, 666 (Bankr. N.D. Iowa 2008) (internal citations omitted). Actual intent can be inferred

from the facts and circumstances surrounding the debtor's conduct. *Id.* To this end, the gratuitous pre-petition transfer of funds by a debtor to the bank account of another following adverse action by a creditor, and the use of a third-party bank account to shield income and pay personal expenses constitutes a fraudulent transfer and concealment of assets warranting the denial of a debtor's discharge. *See, e.g., In re Zhang*, 463 B.R. 66 (Bankr. S.D. Ohio 2012).

9.     Because the required intent is rarely admitted, circumstantial evidence of fraud is often used two establish the requisite intent under § 727(a)(2). Badges or indicia of fraudulent intent include: (1) concealment of pre-bankruptcy conversions; (2) conversion of assets immediately prior to filing bankruptcy; (3) gratuitous transfers of property; (4) continued use by the debtor of transferred property; (5) transfers of property to family members; (6) obtaining credit to purchase exempt property; (7) conveyance of property following the entering of a large judgment against the debtor; (8) a pattern of "sharp dealing" prior to bankruptcy; and (9) conveyances of property rendering the debtor insolvent. *In re Zhang*, 463 B.R. 66, 78-79 (Bankr. S.D. Ohio 2012), *citing Marine Midland Business Loans, Inc. v. Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991) (known as the "Marine Midland factors"); *Jahn v. Flemings*, 433 B.R. 230, 236 (Bankr. E.D. Tenn. 2010) (known as the "Flemings factors").

10.     If the plaintiff establishes the existence of the badges of fraud, the burden shifts to the debtor to rebut the presumption. *In re Eifler*, No. 3:13-cv-00785-JHM, 2014 WL 314473 * 5 (W.D. Ky. Jan. 28, 2014) (internal citations omitted).

11.     A "transfer" is defined broadly and includes every mode, direct or indirect, absolute or conditional, of parting with an interest in property. 11 U.S.C. § 101(54); *In re Bernard*, 96 F.3d 1279, 1282 (9th Cir. 1996). The deposit of money into an account is a "transfer" within the meaning

of Section 727, even if the debtor retains possession. *In re Schafer*, 294 B.R. 126 (N.D. Calif. 2003); *In re Rose*, 574 B.R. 141 (D. Ariz. 2017).

12.     Maintaining a bank account in someone else's name may constitute a concealment. *In re Blasingame*, No. 09-00482, 2015 WL 13106325 *15 (Bankr. W.D. Tenn. Jan. 19, 2015), *citing In re Schulz*, 2000 WL 575505 (Bankr. N.D. Ohio April 21, 2000); *In re Sharp*, 244 B.R. 889 (Bankr. E.D. Mich. 2000).

13.     In *In re Lichtenstein*, unreported, Nos. 04-30172, 04-3296, 2005 WL 1656924 (Bankr. W.D. Ky. June 30, 2005), this Court determined that the plaintiff established both the disposition of property, such as a concealment, and a subjective intent by the debtor to hinder, delay or defraud pursuant to 11 U.S.C. § 727(a)(2)(A) with proof showing that the debtor, within one year prior to filing the petition, deposited approximately $48,770 into his wife's bank account.  In that case, the debtor and his wife both testified that they were aware that the account could not be garnished by debtor's creditors and the court inferred fraudulent intent from this. *Id.* at *3, *citing In re Chambers*, 36 B.R. 791, 793 (Bankr. W.D. Ky. 1984).

14.     The Floyds both testified in their Rule 2004 Examinations that they established the bank accounts in their spouses' names to avoid execution by JM Burns.

15.     The Court finds Bryan Floyd and Scott Floyd made gratuitous transfer of their income to their spouses, that they continued to use the transferred property after the transfer, that such actions were undertaken after a large judgment was entered against them in state court by JM Burns, and that their own testimony confirms that the stated reasons for the transfers were to hinder and delay their creditors, namely JM Burns who was actively pursuing execution against them in state court.

16.     The Floyds testimony was that there conduct was undertaken at the behest of counsel. However, "[t]he defense of reliance of counsel is not crafted to allow debtors to develop a plan to borrow money, funnel it among several accounts with the intent to deceive, search for cover from attorneys, and then discharge the obligation to repay the funneled money in a bankruptcy proceeding." *Eifler v. Wilson & Muir Bank & Trust Co.*, 588 Fed. Appx. 473, 480 (6th Cir. 2014).

17.     The elements of the reliance of counsel defense are: (1) full disclosure of all pertinent facts to counsel; and (2) good faith reliance on counsel's advice. *In re Eifler*, No. 3:13-cv-00785-JHM, 2014 WL 314473 *8 (W.D. Ky. Jan. 28, 2014) (internal citations omitted). A finding that the debtor knew that the purpose of the transfers was to hinder or delay a creditor is inconsistent with good faith and precludes the debtor's assertion of the defense even where he is otherwise innocent of any improper purpose. *In re Eifler*, No. 3:13-cv-00785-JHM, 2014 WL 314473 * 8 (W.D. Ky. Jan. 28, 2014) (internal citations omitted).

18.     The Court finds that the Floyds have failed to establish a defense of reliance of counsel and that such a defense would be inapplicable regardless because the conduct was not reasonable or in good faith.

19.     In addition to the bank accounts, JM Burns also challenged the transfer of $11,000 by Scott Floyd to an individual retirement account shortly before the Petition pursuant to 11 U.S.C. § 727(a)(2) where his tax returns reveals that he contributed only $290 annually to the retirement account in prior years.

20.     A debtor's pre-petition conversion of property from a non-exempt form to an exempt form is not fraudulent to creditors per se, or standing alone, to merit denial of a discharge. *In re Johnson*, 124 B.R. 290, 292-93 (Bankr. D. Minn. 1991). However, a denial of discharge may be

appropriate where such transfer is accompanied by extrinsic evidence of intent to defraud creditors. *Id.* Examples of such extrinsic evidence include: (a) the close temporal proximity of the transfer to the entry of judgment against the debtor in favor of an unsecured creditor or to any other exercise of collection remedies against the debtor; (b) the making of the transfer after the debtor obtained a temporary respite from the collection efforts of creditors; (c) conduct intentionally designed to materially mislead or deceive creditors about the debtor's position; (d) a conveyance of non-exempt assets for less than fair value; and (e) the debtor's continued retention, benefit, or use of the non-exempt property after the transfer, coupled with inadequate consideration for the conveyance. *Id.* (internal citations omitted).

21.      Based upon a review of these factors, the Court finds that the transfer of $11,000 by Scott Floyd to an exempt account made after judgment was entered against him without consideration and for which he retained beneficial use of the funds was made with fraudulent intent sufficient to deny his discharge.

### Denial of Discharge - 11 U.S.C. § 727(a)(3) and § 727(a)(6)

22.      Under 11 U.S.C. Section 727(a)(3), the Court may deny a discharge where the "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." The Code requires debtors to provide creditors "with enough information to ascertain the debtor's financial conditions and track his financial dealings with substantial completeness and accuracy for reasonable period past to present." *Bergeron v.*

*Ross*, 367 B.R. 577 (Bankr. W.D. Ky. 2007).  Upon this showing, the burden shifts to the debtors to justify the lack of records.  *Id.*

23.     11 U.S.C. § 727(a)(6)(A) provides for the denial of a discharge where the debtor has refused to obey any lawful order of the court.

24.     On August 31, 2017, the Court entered Orders in the Floyds' lead cases pursuant to Fed. R. Bankr. P. 2004 permitting examination of the Floyds and requiring they produce certain documents.  When required documents were not produced, the Court issued Orders to produce the documents or show cause why the Floyds should not be held in contempt on February 26, 2018.

25.     Among the documents the Floyds were ordered to produce, but did not produce, were Bryan Floyd's 2014 tax returns, copies of bank account statements, documents evidencing the reimbursement of business expenses for Bryan Floyd,[3] and financial statements given to Casey County Bank and United Cumberland Bank.

26.     While some of the above referenced documents were obtained by JM Burns by subpoenas in the Adversary Proceeding, it was not the Plaintiff's burden to locate this information. The adequacy of a debtor's records must be determined on a case-by-case basis.  Considerations the Court uses to make this determination include the debtor's occupation, financial structure, education, experience, sophistication, and any circumstances that should be considered in the interest of justice. *See, e.g., Taunt v. Patrick*, 290 B.R. 306, 311 (Bankr. E.D. Mich.  2003), *quoting United States v. Trogdon*, 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990).

_____

[3] While Scott Floyd also did not produce any documents evidencing the reimbursement of business expenses, he testified that he had no reimbursed business expenses during the relevant time period.

27.     Here, both Debtors are well educated, sophisticated business people.  The Debtors

clearly had access to this information but chose to delegate the production of the information to their

business manager, Kathy Choate.  Even then, the Debtors did nothing to assist or even review the

information prior to production.  Later, some of the responsive information was still available to the

Debtor when they placed it into a storage space and provided a key to United Cumberland Bank.

The Debtors had access to the information upon request but made no effort to produce it.  When

confronted at trial with the missing information, the Debtors took the position, for the first time, they

lacked the financial resources to obtain the requested information.  Ignoring the dilatory nature of

this testimony and the failure to advise JM Burns of the location or existence of the information, the

Court finds that it lacks credibility given the financial resources expended by the Debtors during the

same time period to fund personal expenses.

28.     Considering all of the above factors, JM Burns has established that the Floyds failed

to keep or preserve adequate records in order to ascertain their financial condition with substantial

completeness.  The Debtors have failed to justify their lack of records.

29.     The failure to produce documents pursuant to the Orders of this Court in the lead

cases with respect to the Rule 2004 Examinations constitutes a failure to obey a lawful Order of the

Court pursuant to 11 U.S.C. § 727(a)(6)(A).  *See Lewis v. Casab*, 523 B.R. 543, 551 (Bankr. E.D.

Mich. 2015).

30.     The Defendants have not demonstrated that their failure to comply with the Orders

was beyond their control or impossible.  The weight of the evidence is that the Defendants lacked

candor and credibility such that the factors under this analysis weigh against them.  Clearly,

Defendants could have obtained the same documents obtained by JM Burns by subpoena.

Therefore, the Debtors are not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(3) and
727(a)(6).

### Denial of Discharge - 11 U.S.C. § 727(a)(4)(A)

31.      11 U.S.C. § 727(a)(4)(A) provides that the court shall grant the debtor a discharge
unless "the debtor knowingly and fraudulently, in or in connection with the case - (A) made a false
oath or account."  For a court to deny a debtor's discharge on this basis, the plaintiff must prove by
a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement
was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with
fraudulent intent; and (5) the statement related materially to the bankruptcy case.  *In re Keeney*, 227
F. 3d 679, 685 (6th Cir. 2000).

32.      Actual intent can be inferred from the facts and circumstances surrounding the
debtor's conduct.  *In re Blackburn*, 385 B.R. 660, 666 (Bankr. N.D. Iowa 2008) (internal citations
omitted).  The intentional omission of information or an incorrect statement on a bankruptcy
petition, schedules, or statement of financial affairs constitutes a false oath.  *Hamo v. Wilson*, 233
B.R. 718 (6th Cir. BAP 1999).  A debtor's demonstrated reckless indifference to truth may also
constitute intent.  *Id.* at 724; *In re Spencer*, 359 B.R. 357, unpublished, *12-14 (6th Cir. BAP 2006).

33.      The material omission from a debtor's sworn statement of financial affairs or
bankruptcy schedules presents grounds for denying a discharge under 11 U.S.C. § 727(a)(4)(A).  *In
re Dolata, Jr.*, 306 B.R. 97, 148 (Bankr. W.D. Pa. 2004) (internal citations omitted).  The test for
materiality is whether the subject matter of the false oaths bears a relationship to the debtor's
business dealings, or concerns the discovery of assets, or the existence and disposition of property.
*Id.*  It is not up to the debtor to decide what it relevant.  The failure to make full disclosure puts the

discharge in jeopardy.  Creditors are entitled to judge for themselves what will prejudice them and

the estate.  *In re Chalik*, 748 F.2d 616 (11th Cir. 1984).  A debtor may not assert as a defense that

omissions or misrepresentations were in regards to worthless assets.  *Id.* at 618.

34.    The knowledge requirement in Section 727(a)(4) does not necessitate an awareness

of a legal obligation to disclose particular information.  *In re Chlad*, 922 F.3d 856, 862 (7th Cir.

2019).  Rather, it is the debtor's knowledge of the omitted information that itself suffices to fulfill

the knowledge element.  *Id.*

35.    Additionally, it is not necessary that a creditor prove that a debtor intended to obtain

a pecuniary benefit through such an omission, reckless disregard for the truth is sufficient to prove

fraudulent intent.  *Id.*  A debtor's reckless disregard for truth may be found through an evaluation

of the circumstances as a whole and the pattern of omissions engaged in by the debtor.  *Id.* (internal

citation omitted).

36.    A fact is "material" where it bears a relationship to the debtor's business transactions

or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of

the debtor's property.  *Id.* at 863-64 (rejecting debtor's argument that $2,000 removed over two

years from an undisclosed bank account was not material in light of over $5,000,000 in debt debtor

sought to discharge) (internal citations omitted).

37.    Courts have found that the failure to schedule bank accounts used by the debtor for

the debtor's own personal use constitute a violation of § 727(a)(4) even when those accounts are in

the name of another person.  *In re Baldridge*, 256 B.R. 284, 289-90 (Bankr. E.D. Ark. 2000) (failure

to schedule bank account in wife's name  when debtor used account for his personal expenses); *In*

*re Roberts*, No. 07-CV-583, 2010 WL 376399 (W.D. Tex. Jan. 25, 2010) (discharge denied when

debtors failed to disclose the existence of a bank account which the debtors continued to use to pay personal expenses for more than two years during the pendency of their bankruptcy).

38.    In *Baldridge, supra*, the court noted the significance of disclosing bank accounts: "Few, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the details of the debtor's finances.  Accordingly, the omission of any and all bank accounts to which the debtor had access constituted a false statement that related materially to the case." *Baldridge, supra at 290.*

39.    Here, the Floyds did not schedule or disclose the accounts they established in their spouses' names in the Petitions.  Nor did the Floyds disclose the numerous other accounts which JM Burns only discovered through subpoenas to nonparties.  *See, also, In re Schultz*, 2000 WL 575505 (Bankr. N.D. Ohio April 21, 2000) (maintaining and concealing account in wife's name constituted concealment resulting in denial of discharge under § 727(a)(2)); *In re Craig*, 252 B.R. 822, 827-28 (Bankr.  S.D.  Fla. 2000) (failure to disclose a bank account in which the debtor deposited funds constitutes a concealment); *In re Mosher*, 417 B.R. 772 (Bankr. N.D. Ill. 2009) (discharge denied when debtor hid funds in corporate account used post-petition to pay a pre-petition debt to his brother).

40.    In addition to undisclosed bank accounts, the Defendants' reported wage income cannot be true as it does not match their tax returns, their W-2s, their loan applications, personal financial statements, or the amount of money deposited into the accounts they established in the names of their spouses.  Neither Defendant offered any plausible or credible explanation for the falsity of their reported incomes.

41.     Additionally, the concealment of an inheritance from a deceased parent coupled with the failure to produce documentation relating to the inheritance is sufficient to justify a denial of discharge.  *In re Milano*, 35 B.R. 89, 91 (Bankr. S.D.N.Y. 1983).  Here, both Defendants did not produce any documents relating to the Will of Betty Floyd until March, 2018 and after repeated requests from JM Burns.  Even then, complete and supplemental information was never provided with JM Burns forced to obtain the probate information directly from the Casey County District Court.

42.     The above conduct is sufficient to require the denial of discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

### Denial of Discharge - 11 U.S.C. § 727(a)(5)

43.     11 U.S.C. § 727(a)(5) provides for the denial of a discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

44.     Both Defendants submitted documentation, such as personal financial statements and loan applications, revealing significantly more assets than have been disclosed in the Petition.  Their Statements of Financial Affairs reveal no transfers of assets in the time leading up to the Petition to account for the loss or disappearance of these assets.

Consequently, the Defendants are not entitled to discharges pursuant to 11 U.S.C. § 727(a)(5).

-31-

## Denial of Discharge - 11 U.S.C. § 727(a)(7)

45.    11 U.S.C. § 727(a)(7) provides for the denial of a discharge where the debtor has committed any of the acts specified in paragraphs (2), (3), (4), (5), or (6) of Section 727, on or within one year before the date of the filing of the petition, or during the case, or in connection with another case, "concerning an insider."

46.    Floyd Industries, Floyd Gate, Chieftain Steel, The Pennyrile Company, Twin F. Trucking, Twin F. Ranch, The Pennyrille Company, Stephanie Floyd, and Jessica Floyd, are all "insiders" pursuant to 11 U.S.C. § 101(31).

47.    Based upon the findings above, the Court finds that the acts committed by Defendants were specified under 11 U.S.C. Section 727(a)(2)-(6) and were concerning an insider.  Thus, the provisions of Section 727(a)(7) likewise preclude a discharge.

## <u>CONCLUSION</u>

For all of the above reasons, the Court finds in favor of the Plaintiff, JM Burns Steel Supply, Inc. and against the Defendant Debtors Bryan Wayne Floyd and James Scott Floyd on its Complaints in Adversary Proceeding 18-1024, consolidated with Adversary Proceeding 18-1025. The Court will enter the attached Judgment denying Defendant/Debtors Bryan Wayne Floyd and James Scott Floyd a discharge in each of their Chapter 7 Cases No. 17-10737 (Bryan Wayne Floyd) and No. 17-10738 (James Scott Floyd), pursuant to 11 U.S.C. §§ 727(a)(2)(A); (a)(3); (a)(4)(A); (a)(5); (a)(6), and (a)(7) of the United States Bankruptcy Code.

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  August 26, 2019

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BRYAN WAYNE FLOYD | ) | CASE NO.  17-10737(1)(7) |
| | ) | |
| _____Debtor(s)___ | ) | |
| | ) | |
| JM BURNS STEEL SUPPLY, INC. | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| vs. | ) | A.P. No. 18-1024 |
| | ) | (consolidated with A.P. No. 18-1025) |
| | ) | |
| BRYAN WAYNE FLOYD | ) | |
| | ) | |
| _____Defendant___ | ) | |

## <u>JUDGMENT</u>

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment is entered in favor of Plaintiff JM Burns Steel Supply, Inc. and against Defendant/Debtors Bryan Wayne Floyd and James Scott Floyd and therefore, both Debtors are denied a discharge in their Chapter 7 cases No. 17-10737 and No. 17-10738, pursuant to 11 U.S.C. §§ 727(a)(2)(A); (a)(3); (a)(4)(A); (a)(5); (a)(6), and (a)(7) of the United States Bankruptcy Code.

This is a final and appealable Judgment.  There is no just reason for delay.

_____
Joan A. Lloyd
United States Bankruptcy Judge

Dated:  August 26, 2019